UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SANKET VYAS, as liquidating
agent for and on behalf of
Q3 I, L.P.,

    Plaintiff,

v.                                                    Case No. 8:22-cv-71-VMC-CPT

POLSINELLI PC, a Missouri
professional corporation,

    Defendant.
_____/

**<u>ORDER</u>**

This matter is before the Court on consideration of Defendant Polsinelli PC's Motion for Summary Judgment (Doc. # 92), filed on February 16, 2023, its <u>Daubert</u> Motions to exclude the testimony of Plaintiff Sanket Vyas's experts (Doc. ## 98, 99), and Vyas's <u>Daubert</u> Motion to exclude Defendant's expert (Doc. # 100), all filed on March 31, 2023. Vyas responded to Polsinelli's Motions on March 31, 2023, and April 21, 2023, respectively. (Doc. ## 97, 112, 113). Polsinelli replied in support of its Motion for Summary Judgment (Doc. # 111), and responded to Vyas's <u>Daubert</u> Motion on April 21, 2023. (Doc. # 110). For the reasons that follow, Polsinelli's <u>Daubert</u> Motion as to Mr. Alfieri is granted in

1

part and denied in part, its <u>Daubert</u> Motion as to Mr. Spencer is denied, its Motion for Summary Judgment is granted in part and denied in part, and Vyas's <u>Daubert</u> Motion is granted in part and denied in part.

## I.   **<u>Background</u>**

### A.   **<u>Q3 Entities</u>**

In 2017, Michael Ackerman, James Seijas, and Quan Tran started a cryptocurrency trading club. (Doc. # 78-2 at 15:7-20). Mr. Ackerman claimed to have developed a trading algorithm that could generate large, reliable returns. (Doc. # 78-12 at 15). In 2018, Mr. Ackerman, Mr. Seijas, and Mr. Tran formed Q3 I, L.P. ("Q3I"), and Q3 Holdings, LLC ("Q3H"), to formalize their cryptocurrency trading club. (<u>Id.</u> at 6, 8). Additionally, Q3H was the general partner of Q3I. (<u>Id.</u> at 8). Mr. Ackerman, Mr. Seijas, and Mr. Tran were members of Q3H and limited partners of Q3I. (<u>Id.</u> at 15-16).

According to Q3I's Private Placement Memorandum ("PPM"), Q3I was responsible for paying "for all ordinary and reasonable operating and other expenses, including, but not limited to, . . . licensing fees" related to the cryptocurrency club. (<u>Id.</u> at 12). Q3H was entitled to "fifty percent (50%) of the net capital appreciation allocated to

2

each Limited Partner [of Q3I] during each calendar month[.]"
(Id. at 9).

From the start of the cryptocurrency trading club until
around August 2018, investors sent their new investments to
Mr. Tran's personal bank account. (Doc. # 78-4 at 23:20-
25:11). After Q3I opened an account with Signature Bank in
August 2018, the Q3I Signature account received deposits from
investors. (Doc. # 78-2 at 92:23-93:15). Funds from the Q3I
Signature account were used to pay Q3H directly. (Id. at
135:22-136:12).

The parties dispute the character of the funds
transferred from Q3I to Q3H. Vyas contends, based on Mr.
Seijas's testimony, that the funds represented in part the 50
percent profit to which Q3H was entitled. (Doc. # 97 at 7-8)
(citing Doc. # 78-2 at 94:10-21, 135:22-136:12). Vyas cites
the following exchange:

> Q. Did you discuss with Mr. McEvoy that in order to
> pay yourselves your 50% profit you preferred not to
> liquidate cryptocurrency in the Bitfinex account,
> but rather wanted to take it from the Signature
> Bank account with new investor funds?
>
> A. We did discuss that, sir[.]" . . .
>
> Q. [S]o my question to you is, why not just
> liquidate part of the coins to take your profit
> from the Bitfinex account?

> A. Because the advice we got, as long as the ledgers matched, dollars are fungible, so it doesn't matter whether I take a dollar out of a Signature account or a dollar out of Bitfinex account and go through all of those steps and market risk and fees and commissions and, you know, labor to essentially accomplish the same thing.

(Doc. # 78-2 at 133:6-15, 135:22-136:12). Polsinelli alternatively asserts that there is no record evidence that the transferred funds were profit. (Doc. # 78 at 7-8). During his deposition, Mr. Seijas gave the following answer when asked whether the Q3I Signature account paid profits to Q3H:

> A. Yes, but I don't think it's – I don't know if I'd classify it as profits. That's where I'm struggling with the answer.
>
> Q. Okay. What would you call it then?
>
> A. Maybe it was either licensing fees or, you know, I'm not sure how I would classify that, but was Signature Bank used to pay some of the GPs? Yes.

(Id. at 94:10-21). Mr. Tran also stated that some of the funds transferred to Q3H were licensing fees and some were profits. See (Doc. # 78-4 at 103:2-13) ("Q. Was Q3 Holdings ever paid any profits from the investments? A. [T]he 50 percent of profits that were allegedly gotten every month was paid out to Q3 Holdings, which the principals split. And then the licensing fee . . . Q. Q3 Holdings, LLC was paid both licensing fees and profits; is that correct? A. Right[.]").

In or around October 2018, Q3I consulted with Greenberg Traurig LLP. (Doc. # 78-56). Greenberg advised that Q3I should treat cryptocurrencies as securities "given the uncertainty surrounding cryptos" and advised that the firm's "fund [attorneys] . . . and . . . CFTC [attorneys] won't get on board" and would not represent Q3I unless it agreed to "approach the product from the standpoint that the fund owns securities[.]" (Id.). Q3I did not retain Greenberg and did not register as an investment advisor. (Doc. # 78-38).

On April 19, 2019, Mr. Seijas signed an engagement letter with Polsinelli. (Doc. # 78-13). The parties dispute whether Mr. Seijas signed on behalf of Q3H or Q3I, but agree that the dispute is not relevant to Vyas's claims. Polsinelli relies on the text of the engagement letter, which is addressed to Q3H and refers to Q3H by name. (Id.). Vyas relies on the title, "GP," that Mr. Seijas wrote next to his signature, arguing that "GP" suggests that he was signing as a general partner on behalf of Q3I. (Id.). According to the terms of the engagement letter, Polsinelli was retained to "represent the company in connection with securities and regulatory matters and such other matters as the company may direct [it]

from time to time and [Polsinelli] agree[d] in writing to undertake[.]" (Id.).

Polsinelli sent several memoranda to Q3, addressing issues including (1) whether Q3H was required to register as an investment advisor and Q3I was required to register as an investment company, (2) whether certain regulatory exceptions could apply, (3) the steps required to register and the potential consequences of failing to register, and (4) potential business options to come into regulatory compliance. (Doc. ## 78-22, 78-25, 78-26, 78-59). Despite Polsinelli's advice, the Q3 entities still did not register. (Doc. # 78-35).

### B.   **Flow of Funds**

On July 9, 2019, David D'Amico, a group director Vice President of Signature Bank, emailed Mr. Tran with a "few easy questions for [the bank's] compliance team:"

> (a) What is the purpose of the incoming funds from various individuals and entities?
> (b) What is the purpose of the majority of the funds being sent to benefit the three account signors?
> (c) Will this activity continue in the same manner?

(Doc. # 78-14). Mr. Tran forwarded Mr. D'Amico's email to Mr. Seijas along with the following message:

> Hey so the basic issue is that it looks like funds deposited from investors are just being transferred to our Q3 holding account to pay us out.
> The reality is that we are sending investor money to the exchange (algo) and buying crypto and then liquidating crypto to USD from the algo to send to Q3 holdings. Instead of losing fees on both sides of those trades, we are registering it in our accounting spreadsheets as such and just pushing funds from Q3 I account to q3 Holdings account. I have spoken with our accountant GARY Chadee and he said that was acceptable to do in this manner as well.

(Id.). Mr. Seijas responded to Mr. D'Amico on July 11, 2019.

(Doc. # 78-15). After reiterating Mr. Tran's explanation of the flow of funds, he stated the following:

> Prior to implementing this strategy change, we cleared it with our accountant Gary Chadee and he stated that was acceptable to do in this matter. We also cleared it with our fund administrator Mr. McEvoy. It is both of their stances that as long as the records are exactly accurate and the funds accounted for then this does serve to save fees and steps and is acceptable.

(Id.). Polsinelli was not a recipient on this email chain.

### C.  **McEvoy Calls**

Denis McEvoy served as the fund administrator for Q3I. (Doc. # 78-2 at 113:7-114:6). Mr. McEvoy was a friend of Mr. Seijas, and Q3I hired him in Spring 2018. (Id. at 83:21-84:13). Mr. Seijas recalled that Q3I endeavored to hire a fund administrator because "probably legal counsel" advised

them to do so. (Id. at 84:16-85:6). Mr. McEvoy was
functionally a consultant, helping Mr. Seijas "oversee[] the
way the fund was structured." (Id. at 84:21-24).

Mr. Seijas discussed the issue of the flow of funds with
Mr. McEvoy in June 2019. (Doc. # 78-3 at 148:21-25). Mr.
McEvoy stated that the flow of funds directly from Q3I to Q3H
was allowable, but that Q3I needed supporting documentation.
(Id.). On October 9, 2019, Mr. Seijas called Mr. McEvoy, again
seeking advice on whether the flow of funds directly from Q3I
to Q3H without first purchasing cryptocurrency was a "valid
way to continue to run the fund." (Doc. # 78-2 at 157:17-24).
He raised the issue a second time because Mr. Ackerman
disagreed with the way Mr. Tran had chosen to handle the flow
of funds. (Doc. # 78-3 at 145:12-25). Mr. McEvoy testified
that Mr. Tran sent him a flow of funds chart, that he
attempted to read on his phone. (Id. at 156:18-157:12). Mr.
McEvoy relied on Mr. Tran "walking [him] through" the chart.
(Id. at 160:16-21). After listening to Mr. Tran describe the
flow of funds, Mr. McEvoy reiterated that it "seemed
reasonable . . . not having to go through those extra steps"
and instead continuing to transfer funds directly from Q3I to

Q3H "as long as you had supporting documentation." (<u>Id.</u> at 162:6-24).

The parties dispute whether the men were discussing the payment of profits. Polsinelli, relying on the testimony of Mr. McEvoy, contends that they were discussing costs associated with running Q3I, not profits. <u>See</u> (<u>Id.</u> at 149:14-16) ("It wasn't discussed, fees – you know, it was costs. It wasn't discussed, performance fees."). Vyas disagrees, arguing that Mr. McEvoy, and other deponents, testified that the call was related to "handling investor funds and profits and other expenses[.]" (<u>Id.</u> at 158:6-14).

Immediately after speaking to Mr. Tran, Mr. McEvoy spoke to Peter Waltz, a Polsinelli attorney, about the flow of funds to "run it by him and make sure my thinking was correct[.]" (<u>Id.</u> at 177:13-25). However, at first, during his deposition, Mr. McEvoy did not recall this conversation. (<u>Id.</u> at 142:6-12). Mr. Waltz's time entry for October 9, 2019, reflects that he spent .2 hours on a call with Mr. McEvoy discussing "compliance issues, payment of fees, AML and related matters regarding fund administration." (Doc. # 78-5 at 3). Mr. McEvoy, later recalling the discussion, stated that Mr. Waltz

told him "he had no problem" with the flow of funds. (Doc. # 78-3 at 178:24-179:6).

On the same day, Mr. Seijas wrote in a text message to Mr. Tran and Mr. Ackerman that Mr. McEvoy had called him to say that "Polsinelli is completely comfortable with the way QT runs the Sig bank account. No issues." (Doc. # 78-19).

**D.   Discovery of Fraud**

On December 2 or December 3, 2019, Mr. Seijas and Mr. Tran visited Mr. Ackerman at his home after discovering that Mr. Ackerman was suffering from alcoholic pancreatitis. (Doc. # 78-2 at 187:3-7). During the visit, Mr. Seijas realized "that something might be wrong." (Id.). He and Mr. Tran asked to log into Q3I's Bitfinex cryptocurrency account, at which point they noticed a "wide discrepancy between what [Mr. Ackerman] was reporting to [Q3H] and what was on the actual screen[.]" (Id. at 209:13-16). Mr. Ackerman had been reporting that the Bitfinex account contained over $100 million, when in fact, it contained "maybe seven figures[.]" (Id. at 209:17-22). Mr. Seijas and Mr. Tran called the authorities after this discovery. (Doc. # 78-27 at 3).

According to the Securities and Exchange Commission, Mr. Ackerman operated a fraudulent securities offering scheme by

"repeatedly and falsely represent[ing] to investors that investment generated monthly profits of approximately 12% to 17% and that Q3 had assets close to $300 million as a result of Ackerman's algorithmic trading success" when in reality he was "doctoring screenshots" of his trading account to "create the illusion that Q3 was highly invested in cryptocurrencies and was extraordinarily profitable." (Doc. # 78-54 at 2).

Mr. Seijas declared that he would have "taken immediate action to inform law enforcement" if Polsinelli had investigated the balances in Q3I's cryptocurrency exchange accounts. (Doc. # 97-19 at 1).

After the discovery of Mr. Ackerman's fraud, Sanket Vyas was appointed as the Liquidating Agent of Q3I to wind up Q3I's affairs and marshal and liquidate its assets for and on Q3I's behalf, including the liquidation of the claim in the instant case. (Doc. # 37 at 3).

E.   **Expert Testimony**

1.   **Vyas's Experts**

Vyas submits the testimony of two experts: Arnold Spencer and Anthony Alfieri.

Mr. Alfieri is a professor of law and founding Director of the Center for Ethics and Public Service at the University

11

of Miami School of Law. (Doc. # 99-1 at 1). He has "taught legal ethics and professional responsibility, civil procedure, litigation and transactional skills, law firm management, and legal malpractice since 1991" and has "written 93 published and forthcoming articles, essays, chapters, and editorials on ethics and professional responsibility, the law of lawyering, and the legal profession in leading law journals, newspapers, and book anthologies." (Id.).

In his expert report, Mr. Alfieri offered the following opinions:

1. Defendants neglected their reasonable duties of competence, diligence, communication, advising, and supervision;
2. Defendants committed negligent misrepresentation by failing to exercise reasonable care and competence in obtaining and communicating information for the guidance of Q3I and others; and
3. Defendants breached their fiduciary duties of care, competence, and diligence, their duty to provide information, and their duty of good conduct.

(Id. at 6).

Mr. Spencer "specialize[s] in representing clients in the cryptocurrency industry and traditional financial institutions interfacing with cryptocurrency companies."

(Doc. # 98-1 at 1). He spent twenty-eight years as an Assistant United States Attorney, "focusing on economic crime and compliance." (Id.).

Mr. Spencer offered in his expert report the following opinions:

1. If investor funds had been deposited into one or more of the centralized cryptocurrency exchanges that Mr. Ackerman was using to purchase and trade cryptocurrencies for Q3I, the cryptocurrency exchanges' compliance departments would have identified his patterns of transactions as suspicious and high risk, and taken actions to close the accounts and report the activity to state and federal government officials.
2. An attorney violates the reasonable standard of care expected of an attorney if the attorney renders an opinion regarding the client's use of a bank account in terms of compliance with securities fraud and anti-money laundering issues without conducting a detailed, due diligence review of the transaction documents, offering documents, and regulatory agreements.

(Id. at 4, 7).

### 2. **Polsinelli's Expert**

Polsinelli offers the testimony of Ira Kustin, a partner at Paul Hastings LLP in New York. (Doc. # 100-1 at 1). Mr. Kustin has practiced corporate law since 1999. In particular, he focuses on representing private fund managers and "advi[sing] with respect to those managers' regulatory and compliance needs." (Id.). He "regularly speak[s] at

13

conferences, write[s] articles and [is] quoted in the press
on matters relevant to the operation of private investment
funds." (Id.).

With respect to Vyas's allegation that Polsinelli
advised the Q3 entities that its flow of funds was acceptable,
Mr. Kustin offers the following opinions:

1. The Attorneys acted within the standard of care
   with respect to their engagement by Q3 Holdings,
   and the Attorneys did not neglect any duty of
   care to their client,
2. The scope of engagement of the Attorneys by Q3
   Holdings did not encompass advice regarding Q3
   Holdings' banking transactions,
3. Q3 Holdings did not, in my opinion, expand the
   scope of the Attorneys' engagement to include
   advice regarding and review of Q3 Holdings'
   banking transactions,
4. Assuming the Attorneys and Q3 Holdings' agent
   had the alleged telephone call (as the Plaintiff
   and/or McEvoy described it) on October 9, 2019,
   the Attorneys' response to Q3 Holdings as
   described by Q3 Holdings' agent (who was the only
   Q3 Holdings representative on the alleged call)
   fell within the applicable standard of care,
5. The advice provided by the Attorneys about
   securities and regulatory matters was, in my
   opinion, accurate and met the standard of care,
6. The Attorneys satisfied their duties of
   competence, diligence, communication, advising,
   and supervision,
7. The Attorneys did not commit negligent
   misrepresentation because they exercised
   reasonable care and competence, and
8. The Attorneys did not breach any fiduciary duty
   of care, competence, or diligence.

(Id. at 3).

**F.    Procedural History**

Vyas initiated this action on January 7, 2022, (Doc. # 1) and filed an amended complaint on March 21, 2022, claiming professional negligence (Count I), negligent misrepresentation (Count II), and breach of fiduciary duty (Count III) based on Polsinelli's alleged advice that the flow of funds, including profits, directly from Q3I to Q3H was acceptable. (Doc. # 37). After the Court denied its motion to dismiss (Doc. # 46), Polsinelli filed its answer to the amended complaint on June 1, 2022. (Doc. # 47).

Now, Polsinelli seeks final summary judgment in its favor or, in the alternative, partial summary judgment on the issue of the timing of damages. (Doc. # 78). Additionally, Polsinelli filed two Daubert motions to exclude the expert report and testimony of Mr. Spencer and Mr. Alfieri (Doc. ## 98, 99), and Vyas filed a Daubert motion to exclude Mr. Kustin. (Doc. # 100). The Motions are ripe for review.

**II.  Legal Standard**

**A.    Daubert Motion**

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or

> otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable. See Id. at 589-90. The Daubert analysis also applies to non-scientific expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). District courts must conduct this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005). The Eleventh Circuit "requires trial courts acting as gatekeepers to engage in a 'rigorous three-part inquiry.'" Hendrix v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010).

The district court must assess whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Id. The proponent of the expert testimony bears the burden of showing, by a preponderance of the evidence, that the testimony satisfies each of these requirements. Id.

### B.   **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g

Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine

issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. Analysis

### A. Polsinelli's Daubert Motion (Spencer)

Polsinelli seeks to exclude Arnold Spencer's expert testimony on the grounds that it does not meet the reliability or the helpfulness requirements of Rule 702. (Doc. # 98 at 8-13). First, Polsinelli challenges as unreliable Mr. Spencer's first opinion that a change to the flow of funds would have led to cryptocurrency exchanges' compliance departments discovering Mr. Ackerman's scheme prior to December 2019 ("Compliance Opinion"). (Id. at 8-11). It argues that such an opinion is speculative and "improperly three stacks inferences." (Id. at 8). Second, Polsinelli challenges as unreliable and unhelpful Mr. Spencer's opinion that an attorney violates the reasonable standard of care by rendering an opinion regarding the compliance of a certain

use of a bank account without first conducting due diligence ("Standard of Care Opinion"). (Id. at 11-13). It argues that the opinion should be excluded because Mr. Spencer relied on a heightened "best practices" standard to form his opinion. (Id.).

In response, Vyas contends that Mr. Spencer's opinions are both reliable and helpful, as he relied on his personal experience in cryptocurrency compliance and enforcement and used the appropriate standard of care in his analysis. (Doc. # 112 at 4-10).

### 1.   **Reliability**

The Court must assess whether the expert's methodology is reliable. "Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial." Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citing Fed. R. Evid. 702, Advisory Committee Notes (2000)). There are four recognized, yet non-exhaustive, factors a district court may consider in evaluating reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and

> publication; (3) the known and potential error rate
> of the methodology; and (4) whether the technique
> has been generally accepted in the proper
> scientific community.

Seamon v. Remington Arms Co., 813 F.3d 983, 988 (11th Cir. 2016) (citations omitted). A district court can take other relevant factors into account as well. Id. (citations omitted).

"If the [expert] witness is relying solely or primarily on experience, then," in establishing reliability, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Frazier, 387 F.3d at 1261 (citation and internal quotation marks omitted). "[A] trial court may exclude expert testimony . . . whose factual basis is not adequately explained." Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1111 (11th Cir. 2005).

Expert opinions must have "a traceable, analytical basis in objective fact." Bragdon v. Abbott, 524 U.S. 624, 653 (1998). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of

the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Here, Mr. Spencer's testimony is reliable as to both the Compliance Opinion and the Standard of Care Opinion. Mr. Spencer developed both his opinions by relying on his personal knowledge and experience. As an attorney who specializes in providing legal services relating to regulatory compliance and enforcement to cryptocurrency investment funds, Mr. Spencer has the experience necessary to properly render the opinions set forth in his expert report. Further, he detailed in his report all the facts he relied upon and the assumptions he made, with references to record evidence. (Doc. # 98-1 at 2-3).

To the extent Polsinelli challenges Mr. Spencer's Compliance Opinion as speculative, such an attack is unavailing. "Hypotheticals . . . need not doom an expert opinion." Mighty v. Miami-Dade Cnty., No. 14-23285-CIV, 2019 WL 4306942, at *9 (S.D. Fla. Aug. 9, 2019), report and recommendation adopted, No. 14-23285-CIV, 2019 WL 4305847 (S.D. Fla. Sept. 10, 2019). To the contrary,

> While [the expert's] opinions may be based on
> hypothetical situations, this does not mean that
> those opinions are speculative. [His] opinions are
> allegedly based on his detailed review of certain
> evidence. . . . To the extent [movant] challenges
> [the expert's] opinions, it will have the
> opportunity to challenge those opinions during the
> trial of this case.

Quorum Health Res., LLC v. Hosp. Auth. of Wayne Cnty.,
Georgia, No. CV208-042, 2010 WL 11537684, at *2 (S.D. Ga.
Feb. 17, 2010). Here, Mr. Spencer's Compliance Opinion is
based on his extensive experience with cryptocurrency
exchange anti-money laundering compliance measures and his
review of the evidence in this case. Therefore, his opinion
is not speculative.

### 2.   **Helpfulness**

To be admissible, expert testimony must also assist the
trier of fact. Fed. R. Evid. 702. "By this requirement, expert
testimony is admissible if it concerns matters that are beyond
the understanding of the average lay person." United States
v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation
omitted). "[T]he court must 'ensure that the proposed expert
testimony is "relevant to the task at hand," . . . i.e., that
it logically advances a material aspect of the proposing

party's case.'" Allison v. McGhan, 184 F.3d 1300, 1312 (11th Cir. 1999) (citation omitted).

So, while "[t]he 'basic standard of relevance . . . is a liberal one,' Daubert, 509 U.S. at 587, . . .[,] if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry[,]' it should be excluded because there is no 'fit.'" Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009) (citations omitted). "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262–63 (citation omitted).

Here, Mr. Spencer's Standard of Care Opinion is helpful to the trier of fact. Polsinelli has pointed to one instance in his deposition where Mr. Spencer testified that conducting additional due diligence prior to answering a question about the appropriateness of a flow of funds structure would be "best practice." (Doc. # 98 at 12 (citing Doc. # 98-3 at 102:1-103:8)). Relying on this quote, it argues that Mr. Spencer improperly held Polsinelli to a heightened standard of care. (Id.). However, in his report and throughout his deposition, Mr. Spencer indicated that Polsinelli "failed to

exercise a reasonable level of care by issuing an extraordinarily broad opinion based on extraordinarily limited due diligence." (Doc. # 98-1 at 8).

Any alleged inconsistency in the standard of care Mr. Spencer applied in his report is best addressed during trial. See Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." (citations and internal quotation marks omitted)).

Therefore, Polsinelli's Daubert Motion as to Arnold Spencer is denied.

**B.   Polsinelli's Daubert Motion (Alfieri)**

Polsinelli seeks to exclude Anthony Alfieri's expert testimony for failing to meet Rule 702's qualifications, reliability, and helpfulness requirements. (Doc. # 99).

**1.   Qualifications**

The first question under Daubert is whether Mr. Alfieri is qualified to testify competently regarding the matters he intends to address. City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 563 (11th Cir. 1998). An expert may be

qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" Clena Invs., Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting Jack v. Glaxo Wellcome, Inc., 239 F. Supp. 2d 1308, 1314–16 (N.D. Ga. 2002)).

"This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." Id. (citations and internal quotation marks omitted). The Court is aware that its "gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)). "Courts must also be mindful that '[e]xpertise in one field does not qualify a witness to testify about others.'" Easterwood v. Husqvarna Pro. Prod., Inc., 576 F. Supp. 3d 950, 958 (M.D. Ala. 2021) (quoting Lebron v. Sec'y of Fla. Dep't of Children & Families, 772 F.3d 1352, 1368 (11th Cir. 2014)).

Polsinelli contends that Mr. Alfieri is not qualified to testify because (1) he is not an expert on securities and regulatory issues related to financial funds and (2) he is only familiar with the Florida Rules of Professional Conduct, which it alleges do not apply in this case. (Doc. # 99 at 2). Instead, it states that he should have applied the Colorado Rules of Ethics because Mr. Waltz, the subject attorney, was barred and practiced in Colorado. (Id. at 5-6). Vyas responds that Mr. Alfieri has sufficient expertise in legal ethics and malpractice to meet the qualifications threshold and contends that he properly relied on the Florida Rules. (Doc. # 113 at 6-15).

The Court finds that Mr. Alfieri is qualified to testify in this matter. First, he has sufficient expertise in legal ethics to opine on the applicable standard of care. As the founding Director of the Center for Ethics and Public Service at the University of Miami School of Law, a professor of legal ethics, and a published author on the topics of ethics and professional responsibility, Mr. Alfieri easily meets the minimal qualification standard under Rule 702 to offer his opinions on the duty and breach elements of Vyas's professional negligence claim. His lack of experience with

securities regulation does not bar his testimony. Mr. Alfieri opines on the "general standards governing ethical and professional conduct applying to all lawyers." (Doc. # 99-3 at 54:17-55:9). To the extent Polsinelli believes his opinion is flawed due to his inexperience with securities regulation, it may do so through cross-examination.

Polsinelli's second argument, that Mr. Alfieri must be familiar with the Colorado Rules of Professional Conduct to offer an opinion in this case, is misplaced. Under Rule 702, Mr. Alfieri need not be an expert on the Colorado Rules of Professional Conduct in order to offer his opinion that Polsinelli violated the applicable standard of care under the Florida Rules of Professional Conduct. This argument also strikes the Court as odd for another reason – Polsinelli's own standard of care expert did not rely on the Colorado Rules of Professional Conduct either, and in none of its filings with the Court has Polsinelli contended that Colorado law applies in this case.

### 2.  Reliability

According to Polsinelli, Mr. Alfieri's testimony is unreliable because it "is based on erroneous premises of facts." (Doc. # 99 at 3). It alleges that Mr. Alfieri relied

only on the allegations in the complaint, which are not record evidence. (Id.). However, Mr. Alfieri stated in his report and during his deposition that he reviewed the affidavits and depositions of Mr. McEvoy and Mr. Seijas and the accompanying exhibits. See (Doc. # 99-1 at 5) ("I reviewed all or parts of the pleadings, motions, discovery materials, court orders, and other papers relevant to this proceeding."); (Doc. # 99-3 at 44:24-45:2) ("I also reviewed the affidavits of Mr. McEvoy, Mr. Seijas, and as well as the McEvoy deposition and the Seijas deposition and the accompanying exhibits to those two depositions.").

"In applying the gatekeeping function, courts must ensure that speculative, unreliable expert testimony does not reach the jury." McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir.2002). "Experts, however, are entitled to state reasonable assumptions." Se. Metals Mfg. Co. v. Fla. Metal Prod., Inc., 778 F. Supp. 2d 1341, 1344 (M.D. Fla. 2011) (citing Maiz v. Virani, 253 F.3d 641, 667 (11th Cir. 2001)). Mr. Alfieri relied on his decades of experience in the field of legal ethics and record evidence to conclude that Polsinelli violated the applicable standard of care. Polsinelli's argument that Mr. Alfieri's opinions

are not fully supported by the record evidence goes to weight, not admissibility. See, e.g., S. Gardens Citrus Processing Corp. v. Barnes Richardson & Colburn, No. 2:11-CV-377-38UAM, 2013 WL 5928676, at *3 (M.D. Fla. Nov. 1, 2013) ("Defendants' challenge to the experts' unfamiliarity with the work of attorneys in the area of international trade law would be properly made through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, but not wholesale exclusion of their testimony.").

### 3.   **Helpfulness**

Polsinelli argues that Mr. Alfieri's testimony improperly goes the ultimate question of whether Polsinelli was negligent. (Doc. # 99 at 3).

"No witness may offer legal conclusions or testify to the legal implications of conduct." Dudash v. S.-Owners Ins. Co., No. 8:16-CV-290-JDW-AEP, 2017 WL 1969671, at *2 (M.D. Fla. May 12, 2017); see also Washington v. City of Waldo, Fla., No. 1:15CV73-MW/GRJ, 2016 WL 3545909, at *3 (N.D. Fla. Mar. 1, 2016) ("[A] witness typically may not 'give purely legal conclusions,' such as that an officer lacked probable cause to arrest, or that a search conducted without a warrant

violated the Fourth Amendment, as such conclusory testimony would 'tell the jury what result to reach' on ultimate issues only the jury should resolve." (citations omitted)). But, the Eleventh Circuit has acknowledged that "the distinction between whether challenged testimony is either an admissible factual opinion or an inadmissible legal conclusion is not always easy to perceive." Hanson v. Waller, 888 F.2d 806, 811 (11th Cir. 1989). Additionally, "the mere reference to a term with legal significance in an expert opinion does not necessarily transform the opinion into an inadmissible legal conclusion." Feldman v. Target Corp., No. 3:19-cv-419-MMH-PDB, 2021 WL 1172794, at *3 (M.D. Fla. Mar. 29, 2021).

In legal malpractice actions under Florida law, expert testimony is generally required to satisfy the plaintiff's burden of demonstrating the duty and breach elements. See Evans v. McDonald, 313 F. App'x 256, 258 (11th Cir. 2009) ("Our review of Florida case law indicates that a legal malpractice plaintiff must present expert testimony to establish the appropriate standard of care (and breach thereof) unless the lawyer's lack of care and skill is so obvious that the trier of fact can resolve the issue as a matter of common knowledge."). "[W]hen the facts of the case

are such that the duty owed and the applicable standard of care are not common knowledge, expert opinion is necessary to establish a breach." Id. (citing Willage v. Law Offices of Wallace and Breslow, P.A., 415 So.2d 767 (Fla. 3d DCA 1982)).

The central issue in this case is whether Polsinelli violated its duty to the Q3 entities by giving allegedly uninformed advice on the appropriateness of the flow of funds from Q3I to Q3H. This issue is beyond the common knowledge of a jury, and, therefore, Vyas is required to present expert testimony on the standard of care. As such, Mr. Alfieri may testify regarding the standard of reasonable care Polsinelli was required to follow.

However, in Conclusions 2 and 3 of his report, he opines respectively that "Defendants committed negligent misrepresentation" and "breached their fiduciary duties." (Doc. # 99-1 at 6). The Court excludes Mr. Alfieri's opinion to the extent he concludes that Polsinelli committed negligent misrepresentation and breach of fiduciary duty in Conclusions 2 and 3 of his report, as such testimony instructs the jury on what result to reach. See Tillman v. C.R. Bard, Inc., 96 F. Supp. 3d 1307, 1325-26 (M.D. Fla. 2015) ("The best resolution of this type of problem is to determine

whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate. Based on the foregoing, the Court will exclude the [experts'] opinions that [defendant] acted negligently or recklessly.").

Thus, the Court grants Polsinelli's Motion as to Mr. Alfieri's conclusion that it committed negligent misrepresentation and breached its fiduciary duty and denies the Motion in all other respects.

### C.   **Vyas's Daubert Motion**

Vyas seeks to exclude Ira Kustin's testimony based on its failure to meet the reliability and helpfulness requirement under Rule 702. (Doc. # 100).

#### 1.   **Reliability**

According to Vyas, Mr. Kustin's testimony should be excluded because he "applies no reliable – or even articulable – standard in reaching his opinions[.]" (Id. at 12). Vyas contends that Mr. Kustin never articulates the applicable standard of care he relied upon to develop his opinions.

The Court disagrees with Vyas's account of Mr. Kustin's testimony. Mr. Kustin relied on his experience as a private

funds attorney, particularly in giving advice to clients trading in cryptocurrency, and his knowledge of the ethical rules to articulate the applicable standard of care in this case. See (Doc. # 100-2 at 64:21-65:3) ("Q. So what is the standard of care that was applicable to the advice – to the answer rather given by Mr. Waltz to Mr. McEvoy? A. Yeah. So, you know, an attorney in that circumstance needs to have the legal knowledge, skill, preparedness and expertise that a prudent lawyer in the same area of practice reasonably needs for whatever the assignment is."). Mr. Kustin confirmed in his deposition that the standard of care he applied in his report came from his knowledge of the American Bar Association Model Rules of Professional Conduct and the New York Rules of Professional Conduct, as well as his review of the Florida Rules of Professional Conduct. (Id. at 65:4-12). He then applied that standard of care to the record evidence, thereby applying his experience to the facts and satisfying the reliability prong of Rule 702. Vyas can address any faults in his testimony through cross-examination at trial.

### 2.   <u>Helpfulness</u>

Vyas argues Mr. Kustin impermissibly assumed that the October 9, 2019, call between Mr. McEvoy and Mr. Waltz did not include a discussion of performance fees or profits, and, therefore, his testimony would not be helpful to the trier of fact. (Doc. # 100 at 7-8).

This argument, once again, goes to the weight, not the admissibility, of Mr. Kustin's testimony. "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." <u>Tillman</u>, 96 F. Supp. 3d at 1320 n.14. In arriving at that opinion, however, an expert may "rely upon disputed facts so long as those facts find support in the record." <u>Guzman v. Holiday CVS, LLC</u>, 2022 WL 10043004, at *2 (S.D. Fla. Oct. 17, 2022). Here, Mr. Kustin relied on the deposition testimony of Mr. McEvoy when he assumed that the October 9, 2019, conversation did not include a discussion of the flow of performance fees or profit. <u>See</u> (Doc. # 78-3 at 149:14-16) ("It wasn't discussed, fees – you know, it was costs. It wasn't discussed, performance fees."). That Vyas points to other record evidence that it contends contradicts this testimony does not prevent Mr. Kustin from relying on Mr. McEvoy's deposition.

However, in Conclusions 7 and 8 of his report, Mr. Kustin opines that Polsinelli "did not commit negligent misrepresentation" and "did not breach any fiduciary duty." For the reasons explained previously, the Court excludes Mr. Kustin's opinion to the extent he concludes that Polsinelli did not commit negligent misrepresentation and did not breach its fiduciary duty in Conclusions 7 and 8 of his report, as such testimony instructs the jury on what result to reach.

Therefore, the Court grants Vyas's <u>Daubert</u> Motion as to Mr. Kustin's conclusion that Polsinelli did not commit negligent misrepresentation and that it did not breach any fiduciary duty and denies the Motion in all other respects.

### D.   **Polsinelli's Motion for Summary Judgment**

Polsinelli seeks final summary judgment in its favor. (Doc. # 78). It claims that it is entitled to summary judgment because there is no admissible evidence that (1) Polsinelli advised any Q3 entity regarding payment of profits or (2) that Polsinelli's alleged advice caused harm to Q3I. Alternatively, it seeks partial summary judgment limiting Vyas's potential damages to monies wrongfully distributed to Q3H after October 9, 2019. The Court addresses each argument in turn.

### 1.   <u>Whether Polsinelli Provided Alleged Advice</u>

Polsinelli first contends that there is no record evidence that any Polsinelli attorney actually advised any Q3 entity that the payment of profits directly from Q3I to Q3H was acceptable. (<u>Id.</u> at 16-18). It points to portions of Mr. McEvoy's deposition in which he stated that he did not recall the substance of a telephone call with Mr. Waltz on October 9, 2019 ("October 9 Call"). (<u>Id.</u> at 17) (citing 78-2 at 142:6-12). Further, Polsinelli cites to another portion of Mr. McEvoy's deposition where he appears to indicate that he discussed only the flow of fees, not profits, from Q3I to Q3H with Mr. Waltz on the October 9 Call. (Doc. # 78 at 18) (citing 78-3 at 149:14-16, 157:5-12). Vyas disputes this characterization of Mr. McEvoy's testimony and points to other sections of his deposition that describe the details of the October 9 Call and indicate they discussed the flow of profits. (Doc. # 97 at 16-21).

There is a genuine dispute of fact regarding whether Polsinelli advised any Q3 entity that the flow of profits directly from Q3I to Q3H was acceptable. While Polsinelli is correct that Mr. McEvoy did testify, when first asked about it, that he did not recall the substance of the October 9

Call, there is also record evidence, including other portions of his deposition, that indicate Mr. Waltz told Mr. McEvoy that the flow of profits was acceptable.

First, Mr. Waltz's time entry for October 9, 2019, indicates that he had a call with Mr. McEvoy "regarding compliance issues, payment of fees, AML [anti-money laundering] and related matters regarding fund administration" demonstrates that the October 9 call actually occurred. (Doc. # 78-5 at 3). Second, after initially indicating he did not remember the details, later in the deposition Mr. McEvoy was able to recall the substance of the October 9 Call. He stated that he attempted to walk Mr. Waltz through the flow of funds chart that Mr. Seijas had just shown him. (Doc. # 78-3 at 178:24-179:6). He also indicated that he understood the flow of funds chart "to be an accurate depiction of how the Q3 entity were [sic] handling investor funds and profits and other expenses." (Id. at 158:6-14).

Further, Mr. Seijas testified that he recalled Mr. McEvoy telling him that he confirmed the flow of funds was acceptable. See (Doc. # 78-2 at 159:22-160:11) ("The only thing I remember is explaining to him the way the accounting was done, and his comment that he checked with Polsinelli and

they're comfortable with it."). Mr. Seijas also sent a text message on October 9, 2019, stating that "Denis called me. Polsinelli is completely comfortable with the way [Mr. Tran] runs the Sig bank account[.] No issues[.]" (Doc. # 78-19).

Taken together, the above evidence could allow a reasonable jury to find that the flow of profits was, at least in part, the topic of the October 9 Call.

### 2.  Evidence of Causation

In its second argument for summary judgment, Polsinelli claims there is no record evidence that, even if Polsinelli did approve the flow of profits, such advice caused Q3I any harm. (Doc. # 78 at 18-20). According to Polsinelli, any of Vyas's potential evidence to the contrary is too speculative to create a genuine dispute. (Id. at 19). In his response, Vyas contends that there is evidence in the record that could lead a jury to find he satisfied the causation element of his claims.

The Court finds that there is a genuine dispute of fact as to whether Polsinelli's alleged advice caused harm to Q3I. Each of Vyas's claims (professional negligence, negligent misrepresentation, and breach of fiduciary duty) stem from the same conduct: Polsinelli's alleged advice on the October

9 Call that the flow of profits directly from Q3I to Q3H was acceptable. Vyas argues that Polsinelli's uninformed opinion prevented the discovery of Mr. Ackerman's fraud. (Doc. # 37 at 2-3).

Under Florida law, in order to demonstrate the requisite causation necessary for each of his claims, Vyas must "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result." Watts v. Goetz, 311 So. 3d 253, 260 (Fla. 2d DCA 2020) (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984)).

In support of his theory that the fraud would have been discovered earlier if not for Polsinelli's uninformed advice, Vyas offers the testimony of Mr. Seijas and Mr. Alfieri. Mr. Seijas stated that he would have obtained access to the Bitfinex account through which Mr. Ackerman perpetrated the fraud if Polsinelli requested access as part of a due diligence review. Further, he stated that he would have immediately contacted authorities – as he did in December 2019 – if Polsinelli had discovered that millions of dollars

were missing from the Bitfinex account. Additionally, Vyas points to Mr. Alfieri's expert testimony:

> If investor funds had been deposited into one or more of the centralized cryptocurrency exchanges that Mr. Ackerman was using to purchase and trade cryptocurrencies for Q3I, the cryptocurrency exchanges' compliance departments would have identified his patterns of transactions as suspicious and high risk, and taken actions to close the accounts and report the activity to state and federal government officials.

(Doc. # 98-1 at 4).

Vyas's evidence is not so speculative as to warrant summary judgment in Polsinelli's favor. See Harris Hunt & Derr v. Taylor, No. 8:21-cv-1457-KKM-TGW, 2022 WL 3155135, at *5 (M.D. Fla. Aug. 8, 2022) (denying summary judgment and finding plaintiff's statement "that, had she been properly informed, she would not 'have spent [her] entire life savings on attorneys' and she 'would have found lawyers that [were not] so expensive'" was sufficient record evidence to create a genuine dispute as to whether defendant's legal malpractice caused her harm); Hotels of Deerfield, LLC v. Studio 78, LLC, No. 21-60980-CIV, 2022 WL 4765339, at *3 (S.D. Fla. July 18, 2022) (denying summary judgment and asserting that defendant's "very argument that Plaintiffs' evidence is based on speculation and conjecture presents issues of credibility

and evidence weighing not fit for resolution at the summary judgment phase" where defendant contended plaintiff could not prove causation through testimony as to what plaintiff would have done in the absence of defendant's negligence).

Polsinelli argues that any evidence that Mr. Seijas would have acted on its advice is belied by Q3I's failure to follow counsel's advice to register as an investment broker. (Doc. # 78 at 19). However, Mr. Seijas's affidavit affirming that he would have acted, taken together with his actions to alert authorities in December 2019, are enough to create a genuine dispute and prevent summary judgment.

Based on Mr. Alfieri's opinion and Mr. Seijas's affidavit, a reasonable jury could find that Vyas has demonstrated that Polsinelli's alleged advice that the flow of profits directly from Q3I to Q3H was acceptable prevented anyone from discovering Mr. Ackerman's fraud. Therefore, the Court denies Polsinelli's Motion as to its request for final summary judgment.

### 3. <u>Limitation of Damages</u>

In the alternative, Polsinelli seeks partial summary judgment, limiting any potential damages to monies wrongfully distributed by Q3H after October 9, 2019. (Doc. # 78 at 20-

21). Polsinelli contends that Vyas has not demonstrated any evidence of alleged negligence other than the October 9 Call, and, therefore, Vyas cannot seek damages prior to that event. (Id.). Vyas disagrees, pointing to an earlier phone call on May 10, 2019 between Polsinelli and Q3I and an email from Mr. Seijas on July 9, 2019, indicating that Mr. McEvoy found the flow of funds structure acceptable.

The evidence relied upon by Vyas does not create a dispute of fact that the only potential act of negligence occurred on October 9, 2019. Neither the May 10, 2019, call during which "business structure and concerns" were discussed nor the July 9, 2019, email where Mr. Seijas stated that Mr. McEvoy – not Polsinelli – approved of the flow of funds indicates that Polsinelli approved of the flow of profits from Q3I to Q3H. As to the email, a communication indicating that Mr. McEvoy approved the flow of funds does not invite a supposition that Polsinelli approved as well. As to the call, a discussion of "business structure and concerns," without more, is not enough to indicate that Polsinelli approved the flow of funds. Finally, Vyas's expert reports focus only on the potential negligence of the October 9 Call. As explained previously, expert testimony is necessary to support Vyas's

claims. See Evans, 313 F. App'x at 258 ("Our review of Florida case law indicates that a legal malpractice plaintiff must present expert testimony to establish the appropriate standard of care (and breach thereof) unless the lawyer's lack of care and skill is so obvious that the trier of fact can resolve the issue as a matter of common knowledge.").

Because there is no record evidence sufficient to demonstrate that Polsinelli's alleged negligence occurred prior to October 9, 2019, the Court grants Polsinelli's Motion as to its request for partial summary judgment. Vyas's potential damages are limited to monies wrongfully distributed by Q3H after October 9, 2019.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Polsinelli PC's Daubert Motion to exclude the testimony of Arnold Spencer (Doc. # 98) is **DENIED.**

(2) Polsinelli's Daubert Motion to exclude the testimony of Anthony Alfieri (Doc. # 99) is **GRANTED** in part and **DENIED** in part. Mr. Alfieri may not proffer legal conclusions at trial, including the legal conclusion contained in Conclusions 2 and 3 of his report. The Motion is denied in all other respects.

44

(3)   Sanket Vyas's <u>Daubert</u> Motion to exclude the testimony of
      Ira Kustin (Doc. # 100) is **GRANTED** in part and **DENIED** in
      part. Mr. Kustin may not proffer legal conclusions at
      trial, including the legal conclusion contained in
      Conclusions 7 and 8 of his report. The Motion is denied
      in all other respects.

(3)   Polsinelli's Motion for Summary Judgment (Doc. # 78) is
      **GRANTED** in part and **DENIED** in part. Vyas's potential
      damages are limited to monies wrongfully distributed by
      Q3H after October 9, 2019. Summary judgment is denied in
      all other respects.

    **DONE** and **ORDERED** in Chambers in Tampa, Florida, this
<u>30th</u> day of June, 2023.

 

                VIRGINIA M. HERNANDEZ COVINGTON
                UNITED STATES DISTRICT JUDGE